Parker, J.
 

 The defendant, David Reuben, and his son, Oleson Reuben, were, by information filed in the superior court for Yakima county, jointly charged with the crime of murder in the second degree, in that they intentionally killed Columbus Sam in that county. They were jointly tried in that court sitting with a jury, which trial resulted in a verdict of the jury finding David Reuben guilty of manslaughter and finding Oleson Reuben not guilty. Final judgment was accordingly rendered against David Reuben, from which he has appealed to this court.
 

 The theory of the defense of appellant in the superior court was justification for the injuries he inflicted upon Columbus Sam resulting in his death; that is, that appellant was acting in good faith and within the bounds of his legal rights in the defense of himself and his son Oleson in inflicting upon Columbus Sam the injuries from which he died a few hours later. There is no controversy here but that the evidence is such as to make the question of appellant’s guilt a question of fact for the jury to decide.
 

 The principal contention here made in behalf of appellant, and the only one, we think, that calls for our consideration upon this appeal, is that the trial court erred to his prejudice in excluding evidence offered by
 
 *655
 
 his counsel that, some two hours before the affray in which Columbus Sam received his mortal injuries at the hands of appellant, Columbus Sam threatened to kill appellant and his son Oleson, which threat was made out of the presence of appellant and his son, and was not communicated to either of them.
 

 The affray in question occurred near two o’clock of a Sunday morning. There had been for some time ill feeling of a very pronounced character between Columbus Sam and appellant. About a week prior to that time, Columbus Sam and appellant had a personal encounter, when Columbus Sam cut appellant with a knife. It is not certain who was then the aggressor, but it seems that appellant was then considerably under the influence of liquor, and that he did not know that he had been cut with a knife by Columbus Sam until after that encounter. All of the participants in the affray here in question and all witnesses of its actual occurrence were Indians. During Saturday night, up until about 10:30 o’clock, Columbus Sam and three other Indians were together in a pool hall at White Swan. Appellant, his son Oleson and another Indian were also together there. All of both parties seem to have been drinking more or less, though apparently none of them was, while there, under the influence of liquor to the extent of being actually drunk.
 

 About 10:30 o’clock, Columbus Sam and his three Indian companions left White Swan on horseback. It was about that time, or possibly when they were shortly thereafter on their way, that the alleged threat was made by Columbus Sam against appellant and his son Oleson, which was sought to be proven in appellant’s defense. Columbus Sam and two of his companions proceeded to a place on a public road opposite a school house, some four or five miles distant from
 
 *656
 
 White Swan, and stopped there for the purpose, as some of them testified, of having some more liquor delivered to them there in accordance with a previous appointment with a bootlegger, which liquor they accordingly received and drank, Columbus Sam being the one who so procured the liquor. Columbus Sam knew that the place was on appellant’s and his son’s way home from White Swan, and that they had not as yet passed that place on their way home from White Swan. About twelve o’clock that night, appellant, his son Oleson and the other Indian of their party left White Swan in the son’s automobile, he driving, while appellant and the other Indian sat in the back seat. Instead of going directly home, they drove in another direction, apparently in quest of additional pleasure, and finally towards their home and passed the school house at near two o’clock Sunday morning.
 

 The son Oleson then saw Columbus Sam there, standing by the fence, and saw his two companions lying on the ground by the roadside. When appellant and his party had driven about a quarter of a mile past Columbus Sam and his companions, according to the testimony of the Indian riding with them, the son Oleson said to his father, “Do you want to go back and square it up,” and that his father replied, “Yes.” But, according to the son’s testimony, he said only, “I see Hinus there in the road. We ought to go back there and see him;” to which the father replied, “All right.” Some other testimony of the son Oleson is to the effect that they thought it likely that Hinus was either hurt or so drunk that he needed to be taken care of. Hinus seems to have been on friendly terms with appellant and his son Oleson, though he was then in Columbus Sam’s company. The son Oleson then turned the car around and drove back to Columbus Sam and his companions.
 

 
 *657
 
 According to his testimony, he then got ont of the car and asked Columbus Sam, “What is the matter with this man,” referring to Hinus; Columbus Sam replying, “Its nothing to you, you stay away from here. ’ ’ The son Oleson further testified that Columbus Sam then attacked him, he defending himself as best he could, both fighting with bare fists. As the fight progressed, Columbus Sam knocked the son Oleson down, and, while leaning over him, proceeded to further punish him. Just then appellant, still sitting in the car, picked up a tire pump lying at his feet, got out of the car and attacked Columbus Sam, striking him with the tire pump, first, according to his testimony, in defense of his son Oleson and later, as he claims, in defense of himself. At some time during the affray, which is not made very clear, according to the testimony of a witness, Columbus Sam moved his hand as if to get it into his right pants pocket, but failed in so doing by reason of the vigorous punishment being inflicted upon him by appellant with the tire pump.
 

 Finally, Columbus Sam was knocked down. The injuries inflicted upon his head and skull were such that he died a few hours afterwards. Appellant and his son left the scene of the affray before Columbus Sam died. There was found in the right pants pocket of Columbus Sam after his death an open pocket knife, with a blade about three inches long. We have thus noticed some of the outstanding facts to the end that it may be made plain that there is evidence of a substantial character pointing to appellant’s right to defend his son in the first part of the affray, and to defend himself in the second part of the affray; and also to show that there is evidence of a substantial character pointing to Columbus Sam as the assailant and aggressor at the beginning of the affray.
 

 One Eyle, an Indian in Columbus Sam’s party,
 
 *658
 
 went with them from "White Swan, but left them on the way before arriving at the school house. He is the witness whom counsel for appellant sought to have testify to a threat made by Columbus Sam against appellant and his son Oleson at near the time they left White Swan. The record of this offer of proof is, so far as need be here noticed, as follows:
 

 “Mr. Shively [counsel for appellant]: Q. What time did you leave White Swan that night? A. About half past ten. Q. Who did you leave with? A. Columbus Sam. Q. Anybody else? A. Hinus. Q. Anybody else? A. Oscar. Q. Anybody else? A. That is all, just the four of us. Q. Did you hear Columbus Sam that evening say anything against either Oleson Reuben or David Reuben? Mr. Clark [counsel for the state]: I object unless in the presence of the defendants or communicated to them. [The court sustained this objection.] Mr. Shively: I offer to prove by this witness that between eleven and twelve o’clock, on the night of the 10th of December, and about two hours before this occurrence in which Columbus Sam was hurt, that Columbus Sam said in the presence of this witness that he was going to kill Oleson and David, too, and that this witness tried to get him to go home. When I say ‘Oleson’ and ‘David’ I mean Oleson and David Reuben. Mr. Clark: We object. The Court: Objection sustained.”
 

 An exception was then noted in behalf of appellant. So far as can be determined from the record, this offer of proof was objected to by counsel for the state and rejected by the court upon the ground .that the threat of Columbus Sam was made, if made at all, out of the presence of appellant and his son, Oleson, and not communicated to eithér of them.
 

 It seems clear to us that the rejection of this offered proof was erroneous, to appellant’s prejudice, unless there be some other tenable ground to support the ruling of the court. It is plain that the defense was being
 
 *659
 
 conducted upon the theory that appellant was justified in his striking and injuring Columbus Sam with the tire pump, and that appellant was then acting within his legal rights in so defending his son Oleson and himself. While it is true that, though the threat sought to be proven by the testimony of Eyle was not communicated to appellant or his son and thus could have no influence upon the mind or motive of appellant, nevertheless the threat, if made by Columbus Sam, did have some legitimate bearing upon the question of whether or not he was the assailant and aggressor in the inception of the affray, which was a very material inquiry incidental to appellant’s exercise of his right of defense of his son and in turn of himself. The applicable rule was well stated by Chief Justice Jones in the early case of
 
 White v. Territory,
 
 3 Wash. Terr. 397, 19 Pac. 37, as follows:
 

 “The sixth instruction asked for and refused was as follows:
 

 “ ‘Uncommunicated threats are only valuable in a case of this kind as tending to show the feeling and intent of the deceased towards the defendant at the time of their encounter, and whether or not the deceased was the first assailant, and whether or not the deceased so acted at the time of the shooting as to induce in the mind of the defendant an honest belief that the deceased intended to kill him, or do him great bodily harm. Communicated threats are valuable for the same purpose, and as also tending to throw light on the state of mind of the defendant at and just before the shooting, and as tending to show that his acts in shooting were not malicious.’
 

 “We think this instruction should have been given. It is correct in law, and the circumstances of the case made the rule stated applicable.”
 

 This view of the law was adhered to by this court in
 
 State v. Cushing,
 
 14 Wash. 527, 45 Pac. 145, 53 Am.
 
 *660
 
 St. 883. Judge Gordon, speaking for the court therein, said:
 

 “There was evidence tending to show that the deceased had, prior to the morning of the encounter, in conversation with different parties, made threats against the appellant, none of which, however, were communicated to the appellant. It further appeared
 
 by the
 
 testimony of the appellant himself, that
 
 on the
 
 morning of the encounter the deceased made repeated and violent threats against him. The following instruction upon the subject of threats was requested and refused: . . .
 

 [Same instruction as noticed in
 
 White v.
 
 Territory]
 

 “This instruction was approved by the territorial supreme court in
 
 White v. Territory, supra,
 
 and is sustained by
 
 Brown v. State,
 
 55 Ark. 593 (18 S. W. 1051);
 
 Wiggins v. People,
 
 93 U. S. 465. We think it correctly states the law upon the subject of noncommunicated threats and threats made directly to a defendant. The court, however, refused to give it or any instruction whatever upon the subject. This we think was error.”
 

 Plainly, this is in effect a holding that proof of such nncommunicated threats is admissible when there is substantial evidence of justifiable defense as in this case.
 
 2
 
 Wharton’s Criminal Evidence (10th ed.), § 757; 2 Jones, Commentaries on Evidence (2d ed.), § 634. It is not contended but that appellant’s right of defense of his son was, in substance, the same as his right of defense of himself. Section 2406, Rem. Comp. Stat., leaves no room for doubt on this question. We there read:
 

 “Homicide is also justifiable when committed either—
 

 “(1) In the lawful defense of the slayer, or his or her husband, wife, parent, child, brother or sister, or of any other person in his presence or company, when there is reasonable ground to apprehend a design on the part of the person slain to commit a felony or to
 
 *661
 
 do some great personal injury to the slayer or to any such person, and there is imminent danger of such design being accomplished; . .
 

 Contention is made by counsel for the state that, in any event, the offer of proof was properly rejected by the court because the evidence fails to show in any substantial measure that appellant’s striking of Columbus Sam with a tire pump, as he did, was a justifiable act of defense of his son or himself under the circumstances. It may be that the court might have so concluded as a matter of fact if it were trying the fact. But we think it could not so conclude as a matter of law, or as a matter of discretion, as counsel for the state seem to argue; in view of the evidence tending to show the facts we have above noticed. Indeed, the trial judge manifestly was of the opinion that appellant’s theory of justification, that is, the defense of himself or his son, had sufficient support in the evidence to call for the decision of such justification, and, incident thereto, the question of who was the assailant and aggressor in the inception of the affray, as questions of fact for the jury to decide. This is plainly evidenced by the trial judge’s instructions, somewhat elaborately given to the jury, touching those questions. So we conclude that the ruling of the trial court rejecting the offered proof of threats made by Columbus Sam against appellant and his son Oleson has no support in the theory of this contention.
 

 Counsel for the state made some further contention in support of the trial court’s ruling rejecting this offered evidence of threats made by Columbus Sam against appellant and his son Oleson, rested upon the theory that the ruling was at all events without prejudice to appellant because the offered proof was merely cumulative of the other proof of ill feeling existing between Columbus Sam and appellant, and proof
 
 *662
 
 of other threats made by Columbus Sam. While there is considerable evidence showing ill feeling theretofore existing between Columbus Sam and appellant, and of expressions made by Columbus Sam in the nature of threats, there does not appear in the record any other evidence of actual threats of death made by Columbus Sam as against appellant and his son Oleson. We think that this contention cannot be sustained.
 

 We conclude that the judgment must be reversed and appellant awarded a new trial. It is so ordered.
 

 Mitchell, C. J., Tolman, Beals, and Millard, JJ., concur.