[No. 29069.   Department Two.   October 19, 1943.]

THE STATE OF WASHINGTON, *Respondent,* v. LEWIS EUGENE BROWN, *Appellant.*[1]

*E. K. Marohn,* for appellant.

*Lloyd Shorett* and *Wm. R. Bell,* for respondent.

MALLERY, J.—The appellant was charged with the crime of first-degree assault, alleged to have been committed December 1, 1942, upon the person of Evelyn Sam, a fourteen year old girl. The gist of the charge is that the appellant assaulted the said Evelyn Sam with a deadly weapon, to wit, a screw driver, with intent to commit the crime of indecent liberties. The scene of the crime was a lonely country road used by from none to four automobiles a day, with bushes and trees rising to a height of more than six feet on each side of the road. There are only two houses close to the road, and both of these are vacant.

[1]Reported in 142 P. (2d) 257.

The appellant was a laborer employed by King county in cutting brush, digging ditches, etc. Several days before the date of the crime, the appellant had been cutting brush along this road. He had seen Evelyn Sam coming from school. On that occasion, the appellant had asked her to ride with him in his automobile. She had refused.

On December 1, 1942, the appellant had been working, digging a ditch some miles from the West River road. He claims to have been drinking wine after leaving work, and to have become very intoxicated. The reason he assigns for driving down the West River road (which was not on his way home) was that he had lost a glove there several days before when he was cutting brush.

According to Evelyn Sam, the appellant arrived at the West River road a few minutes after she had left the school bus. She had stopped to look at the river because it was in a flood stage. He stopped his car and asked her if she wanted to ride; she said, "No." He said that she was "scared," and that she would "get used to it after awhile." He kept looking at her in a "funny way," and repeatedly asked her to get in the car. Finally he drove on down the road, and she commenced walking home. The appellant turned his car around, and passed Evelyn going in the opposite direction, turned around again, and asked her if she wanted a ride. She said, "No," and started to walk faster. She heard the door of his car slam, and she started running. She had run about one hundred and seventy-five feet before the appellant caught her. He grabbed her by the arm and she started to scream. He then put his hand over her mouth; she started kicking and bit his finger and tried to hit him with her notebook. Just then they could hear a car coming, although they could not see the car because of the bushes and the winding road. The appellant then took a heavy screw driver out of his side pocket and jabbed the point down on her head. Blood started gushing from the wound, and the appellant turned the screw driver around, hitting her repeatedly with the

handle. During this time, he kept her to one side of the road toward the bushes, and she was screaming.

The car went past and stopped, the occupants returning to investigate. The appellant ran back to his car, turned it around, and temporarily escaped. There were three occupants in this car, A. V. Pinkney, who had the Post Intelligencer route in this area, Gene Woven, and Elmore Dubuque.

Just at this time, W. C. Jacobs, who had been hunting, drove on the scene. The Dubuque boy stopped Jacobs, got him to turn his car around and give chase to the appellant. They caught up to the appellant at a service station near Kent, where he had pulled in because his car was steaming. The appellant had driven it at a speed of fifty miles an hour in leaving the scene of the crime. Dubuque and Jacobs, the latter carrying a loaded shotgun, went into the service station and forced the appellant to remain there while the police were called. Mr. Jacobs testified concerning the appellant's condition:

"He smelled of intoxicants. He didn't stagger. He talked coherently. I don't believe you could under any circumstances imagine that he was drunk, intoxicated."

Evelyn Sam was taken home by Mr. Pinkney and Mr. Woven and later taken to Dr. Hoffman in Kent, who testified concerning the wound on her head.

The appellant was taken to the Kent jail, where he made a confession. Later he made another confession to the captain of detectives in the sheriff's office. The appellant at all times has denied that he had any intention to take indecent liberties with Evelyn Sam.

During the course of the trial, the state offered exhibit No. 13, which was a photograph of the scene in which Evelyn had placed a handkerchief on a bush to designate the point where the appellant caught her. The appellant's attorney objected to this exhibit, and the court indicated he was going to admit the exhibit, stating to counsel, "You can ask her where, if you wish," to which counsel for the appellant replied: "What kind of questions can I ask that

will obliterate such a glaring white mark on this? This has been done wrong. It should be done right." The court then asked, "Are you disputing the assault?"

The following then took place:

"Mr. MILLER: I don't believe I am called on to answer that question at this time. THE COURT: This evidence here, are you denying it? I mean with the admissions, confessions and all that? Mr. MILLER: I don't believe . . . THE COURT: Your theory is that the intent is missing to commit the felony? Mr. MILLER: I don't believe I should be called on at this time to make any statement. THE COURT: I think that is your theory all the way through in your examination and all that. That seems to be your theory, that he lacked intent to commit the felony, to wit: taking indecent liberties. . . .

"Now, the rest of it—well, the court under the circumstances of the case, the court isn't going to be so meticulous about the matter as it would be if conditions were different, if the issues were different, if the charge were different, if there were no admissions. Mr. MILLER: At this time . . . THE COURT: (interposing) Did you expect to accompany the officer out there, with the little girl? She went there with the officer, and she was the one who knew where it took place. . . .

"Now do you want her to mark it on this photograph? Mr. MILLER: Now I don't want her to mark it on that photograph because I say, that photograph is inadmissible. THE COURT: I disagree with you. I will overrule the objection."

The appellant makes the following assignments of error: (1) The trial court erred in denying appellant's motion for a mistrial, based upon the court's comments upon the evidence in the presence of the jury; (2) the trial court erred in denying appellant's motion that the charge of first-degree assault be dismissed for insufficiency of the evidence; (3) the trial court erred in denying appellant's motion for a new trial or, in the alternative, for an arrest of judgment.

The constitutional provision that the trial judge shall not comment upon the evidence means no more than

that the trial judge is prohibited from action or words having the effect of conveying to the jury the trial judge's personal opinion as to the truth or falsity of any evidence. This court has said:

"But we do not think it was intended by this provision to prevent the judges from giving counsel the reasons for their rulings upon questions presented during the progress of the trial, or to prohibit them in all cases from stating, when necessary, the facts upon which they base their conclusion." *State v. Surry,* 23 Wash. 655, 63 Pac. 557.

See, also, *State v. Hughlett,* 124 Wash. 366, 214 Pac. 841; *State v. Elder,* 130 Wash. 612, 288 Pac. 1016.

In the case at bar, the statements complained of were made while ruling upon an objection to the admissibility of evidence. They did not indicate the judge's opinion as to the truth or falsity of any evidence in the case.

■ In his next assignment of error, appellant contends that no overt act is shown indicating that he had any intention of taking indecent liberties with the complaining witness.

On this subject it was said in *Patterson v. State,* 85 Ga. 131, 11 S. E. 620:

"Where it takes a particular intent to constitute a crime, that particular intent must be proved to the satisfaction of the jury. It does not require direct or positive proof, but the circumstances must be such as would authorize the jury . . . to infer the intent with which the act was done."

■ In the case at bar, the jury was authorized to find that all of the circumstances were proven beyond a reasonable doubt; were consistent with each other; and were consistent with an intent, by appellant, to take indecent liberties with the complaining witness; and that they were inconsistent with any reasonable hypothesis that would negative such an intent. This meets the requirements of the law with regard to circumstantial evidence. The jury was not required to find appellant's testimony, that his intent was

to take the complaining witness home, was a reasonable hypothesis, in the light of all the circumstances.

The judgment is affirmed.

SIMPSON, C. J., MILLARD, BLAKE, and ROBINSON, JJ., concur.

November 30, 1943. Petition for rehearing denied.